613 F.2d 1025
 198 U.S.App.D.C. 292
 ALUMINUM COMPANY OF AMERICA, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondent,
International Paper Co. and Scott Paper Company, Illinois
Central Gulf Railroad Co., et al., Intervenors.
ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Illinois Central
Gulf Railroad Company, Southern Railway Company,
and Louisville and Nashville Railroad
Company, Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
International Paper Company and Scott Paper Company, Intervenors.
 Nos. 78-1505, 78-2155.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 17, 1979.
Decided Nov. 19, 1979.
 
 John W. Adams, Jr., Mobile, Ala., with whom Donal L. Turkal, St. Louis, Mo., John F. Smith, Louisville, Ky., William H. Teasley, Washington, D. C., and David J. Kaufman, were on the brief, for St. Louis-San Francisco Railroad Co., et al., petitioner in No. 78-2155 and intervenor in No. 78-1505.
 Dickson R. Loos, Washington, D. C., for petitioner in No. 78-1505.
 Ellen K. Schall, Atty., I. C. C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel, Barry Grossman and Ron M. Landsman, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondents. Christine N. Kohl, formerly Deputy Associate Gen. Counsel, I. C. C., Washington, D. C., was also on the brief.
 Olga Boikess, Washington, D. C., for Intervenor, International Paper Co., et al. in No. 78-1505 and No. 78-2155.
 Also John H. Powers, III, Dept. of Justice, Antitrust Div., Washington, D.C., entered an appearance, for respondent, United States of America.
 Before LEVENTHAL and WALD, Circuit Judges, and PENN*, United States District Court Judge for the District of Columbia.
 Opinion for the Court filed by Circuit Judge LEVENTHAL.
 LEVENTHAL, Circuit Judge:
 
 
 1
 These appeals seek to set aside orders of the Interstate Commerce Commission (Commission) rendered in a consolidated proceeding. In No. 78-1505, the Aluminum Company of America (Alcoa) seeks review of the Commission's ruling that line-hauled railroads serving Alcoa's Mobile, Alabama, plant need not absorb fully the switching charges of a terminal railroad on shipments to and from the Alcoa plant. In No. 78-2155, the line-haul railroads seek review of the Commission's ruling that their refusal to absorb fully the switching charges of the terminal railroad on shipments of pulpwood and wood chips to two paper companies with facilities at Mobile is a violation of Sections 1(6) and 2 of the Interstate Commerce Act. For the reasons stated below, we affirm the Commission's order in No. 78-1505, and in No. 78-2155, we remand the record to the Commission for clarification of its reasoning.
 
 
 2
 * Those industries in Mobile, Alabama, which are located within the confines of the Alabama State Docks are served by a terminal railroad, an agency of the State known as Terminal Railway Alabama State Docks (TRASD). Alabama State Docks is divided into three zones. Switching charges are assessed by zone. Alcoa's plant is in zone one, which has water access but is not physically reached by any of the line-haul carriers. TRASD connects with several line-haul carriers at interchange tracks approximately two miles from Alcoa's plant. The International Paper Company (IP) and the Scott Paper Company (Scott) facilities are located in zone two. Southern Railway physically reaches the plantsite of IP, and the Louisville & Nashville Railroad Company reaches the plantsite of Scott.
 
 
 3
 TRASD publishes a tariff of switching charges. Prior to November 1, 1975, the entire amount of switching charges in zone one were absorbed by the line-haul carriers. Thus, the line-haul carriers published absorption tariffs providing for absorption of the exact amount of the TRASD charges. In zones two and three, the same practice prevailed on all freight except pulpwood and wood chips. On those commodities, the line-haul carriers had limited their absorption to approximately two-thirds of the switching charge.[1] The difference (approximately $6.00 per car) was paid by the paper companies.
 
 
 4
 Effective November 1, 1975, TRASD increased all of its switching charges. The line-haul carriers did not increase their absorption by a corresponding amount. Since November 1975, the line-haul carriers have been billing Alcoa, in addition to the line-haul rate, $8 per car, the difference between the absorption tariff and TRASD charges. In zones two and three, the new TRASD charges were fully absorbed on all freight other than pulpwood and wood chips. For these two commodities, the line-haul carriers now absorbed only about half of the TRASD charge, billing the paper companies approximately $11 per car.II
 
 
 5
 We turn first to the petition for review brought by Alcoa (No. 78-1505). In that ruling, the Commission applied the doctrine that the published line haul rates include delivery only to points actually on the line of the carrier, in the absence of tariff provisions to the contrary. This principle is consistent with the past decisions of the Commission.
 
 
 6
 The carriers do have the authority to add to the line haul tariff a separate switching absorption tariff, in which the carrier undertakes to absorb switching charges of another carrier whose services begin after the completion of the line haul.
 
 
 7
 Alcoa contends that the tariff indicating rates from and to "Mobile" must be construed in conjunction with the carrier's industrial guide, which shows Alcoa as a Mobile plant. Alcoa suggests that it is only asking for a reference to the guide in order to clarify the tariff. The Commission is of the view that the provision of the tariff relating to the switching charges clearly indicates that the switching charges are not entirely absorbed, and that the guide cannot alter its impact.
 
 
 8
 Overall the court is of the view that this is a matter of interpretation of the tariff in which the expertise of the Commission requires that we give its ruling particular deference. The effect of the Commission's ruling is that Alcoa, which is located in Zone 1 of the Terminal Railway Alabama State Docks (TRASD) switching zones, a zone not reached by any line-haul carrier, may not challenge the carrier's practice of absorbing or failing to absorb switching charges unless the practice results in forbidden discrimination or some other violation of the statute appears. Having considered the various arguments made by the petitioner in light of the record materials provided for our review, the court sees no basis for concluding that the Commission's action was arbitrary or erroneous as a matter of law.
 
 III
 
 9
 We now turn to the petition for review filed by the railroads (No. 78-2155). This petition challenges the ruling of the Commission that, for the paper companies (International Paper and Scott Paper) located in switch zone 2, the line haul carriers are required to absorb switching charges paid by the carriers to TRASD for switching services.
 
 
 10
 The court is in need of further illumination from the Commission as to its rationale. The Commission appears to have relied on the Lilley Exhibit, which it felt demonstrated "a widespread practice of absorption of switching charges" for other papermills in the South, as "strong evidence" of the reasonableness of the practice of absorption. It is not clear whether there is substantial evidence to support the existence of such a "widespread practice." The railroads provided the court an analysis of the 75 examples identified in the Lilley exhibit, which analysis purports to show that, in all, there are only four instances of "absorption." Counsel for the ICC put it that the number of cases may have been slightly higher.
 
 
 11
 The railroads submit that, of the 75 examples shown in the Lilley exhibit, 39 involved plants that are physically reached by only one line haul carrier, which makes deliveries over its own tracks with no extra charge because it has the obligation to make such deliveries; thus, they argue, there are no switching charges involved and there is no absorption of switching charges. In 22 instances, mills are physically reached by two or more carriers who are obligated as part of their common carrier duty to make delivery to these mills on the line. Again, there is an obligation of the line haul carrier to perform the delivery services, even though it may choose to use another carrier for the final delivery. Here, again, it is asserted that the obligation of the line haul carrier to make complete deliveries means that there is no true "absorption of switching charges." In 10 instances the line haul carrier does not physically reach the facility of the receiver, and the switching charges are paid by the industry in addition to the line-haul rate. In only four instances, say the carriers, are switching charges absorbed.
 
 
 12
 The reference to "widespread practice of absorption of switching charges" suggests that the ICC defined the relevant universe to include all line haul carriers which deliver to papermills to the South, without regard to whether the railroads' own lines reached the industry plant involved. Switching charges, of course, cannot be absorbed if they are not included (I. e. if delivery is made on the carriers' own lines). Similarly, if the carrier's own line reaches the plant but the carrier makes delivery over another line, it seems absorption is required by law, as a carrier must deliver to points on its line at the published line haul rate. Such "absorption" is not a proper basis for widespread practice.
 
 
 13
 At oral argument, Commission counsel argued in support of the Commission's order that even if the universe of industry plants off the rails of line-haul carriers was the relevant universe, the existence of absorption in 4 (or perhaps 6) of 10 cases would be "widespread." It is by no means clear that such small numbers are what the Commission had in mind in citing "widespread practice," and the court would want clarification that this was the approach of the Commission before ruling in the case.
 
 
 14
 Counsel for the paper companies has a different approach, which stresses that the uniform rate scale uniquely applicable to the paper industry in the South was cost based, and that the costs were determined to include switching. The report of the economic consulting firm, L. E. Peabody & Associates, Inc., said in describing the switching costs included in the cost based figures:
 
 
 15
 Destination switching is defined as all switching performed by road trains, yard engines, and switching and terminal companies for the placement of the loaded car Subsequent to the last line-haul movement and the pulling of the empty prior to the first line-haul movement. Switching movements not involving pulpwood and wood chip cars will not be considered in determining destination switching applicable to pulpwood and wood chips. Non-productive time will be developed and allocated to productive time. (Emphasis added.)
 
 
 16
 J.A. at 122. Since the shippers are paying for such switching, in view of the way in which the cost-based line haul rates were determined, the paper companies submit that it would be double counting to add a switching charge, although it was acknowledged at oral argument that the Commission did not expressly refer to this contention.
 
 
 17
 There is an allusion in the ICC opinion to the fact that "the prevailing line haul rates reflect a uniform mileage scale for traffic movement throughout the territory." J.A. 610. However, that reference is too abbreviated to make clear to the court the Commission's rationale.
 
 
 18
 It occurs to the court that the Commission may have intended to say that in a situation where there are uniform mileage charges, city area to city area, and where the plants involved are served by at least one line haul carrier, and in most instances there is no addition of switching charges, that it is unreasonable to add switching charges. To put it another way, since at least one line haul carrier has the obligation to deliver to the plant, the objective of the uniform charges would be defeated if any carrier added switching charges. However, this was not articulated by the Commission, and therefore the court cannot affirm on the basis of this approach. In the circumstances, the court is of the view that its review function requires that it remand the record to the Commission for clarification of its reasoning. The Commission is required to supplement its opinion. It has leave of court to modify its order if it be so advised.[2]
 
 
 19
 So ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 292(a)
 
 
 [1]
 The Southern Railway Company did not absorb the switching charge for shipments of wood chips
 
 
 [2]
 On November 2, 1979, counsel for the appellant in No. 78-2155 submitted a copy of the decision of the ICC in Absorption of Switching Charges, Southern Territory (ICC Docket No. 9206, October 1, 1979). That decision is not before us for review. If there is some divergence of approach, the ICC can harmonize its rulings when it takes up on remand No. 78-2155, its ruling on the absorption of switching charges for the paper companies